Filed 9/9/16  P. v. Thomas CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B265803 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA131607) |
| v. | |
| DAVEON M. THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert J. Higa, Judge.  Affirmed as modified.


Richard D. Miggins, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Daveon Thomas was convicted of multiple counts of forcible lewd acts with a person under 14, for molesting his two young cousins, T.D. and T.J. On appeal, he challenges the sufficiency of the evidence that his single offense against T.D. was committed by force, duress or fear. We agree and reduce the conviction to its non-forcible lesser included offense, although this does not affect defendant's sentence because the offense was committed when both crimes had the same sentence. Defendant also contends the trial court erred in its handling of the support persons who accompanied the minor victims to the witness stand and its admission of evidence regarding Child Sexual Abuse Accommodation Syndrome (the Syndrome); we disagree. Finally, we agree that defendant is entitled to one additional day of presentence credit. We therefore modify the judgment and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Evidence Presented to the Jury*

The molestation occurred among members of an extended family. Among family members, the defendant's (and victims') grandfather's home was a communal house; all members of the family would drop in at any time. Defendant and his mother lived at the grandfather's house. Defendant had a bedroom in the house, although he slept in the living room, allowing anyone in the family to use his bedroom. There was a video game console in defendant's room.

A.    Offense Against Defendant's Girl Cousin, T.D.

In 2009, when T.D. was five years old, and defendant was a teenager, T.D. was at her grandfather's house for a family party.[1] When the adults were off doing other things, T.D. was told to take a nap in defendant's room. When she was lying on the bed, defendant entered the room, pulled down T.D.'s pants, and touched her buttocks. She did not tell anyone for years.

---

[1]    Defendant's age was not offered into evidence at trial; however, when he was arrested in 2013, he was just out of high school.

2

B.    Offenses Against Defendant's Boy Cousin, T.J.

From 2011 into 2013, defendant repeatedly molested T.J.; T.J. was 10 years old when the molestation started. Defendant's acts of molestation took different forms. Most times, he would force T.J. into defendant's room and throw him face down on the bed. T.J. would struggle and try to fight back, but defendant was much larger. Defendant would lie on top of T.J. Sometimes, defendant would remove T.J.'s pants and underwear. On approximately 10 occasions, he digitally penetrated T.J.'s anus. Twice, defendant licked T.J.'s anus. Defendant rubbed his body against T.J. over 10 times; T.J. could feel defendant's penis against him. T.J. always tried to kick and scratch defendant to fight back; on one occasion, defendant choked T.J. to accomplish the molestation.

The first time defendant attacked him, T.J. was in defendant's room playing video games alone. When he got up to leave, defendant grabbed him in the hallway and pushed him back in the room. Defendant continued to molest T.J. when T.J. would visit the grandfather's house. T.J. would go into defendant's room to play video games; defendant was never in the room when he would go in. Although there were adults present in the house, he did not cry out; nor did he report the molestation to his parents when he was safely out of the house. T.J. was scared of what people would think; he thought his father would be angry at him.

C.    Disclosure

T.J. has twin siblings who are T.D.'s age. In August 2013, T.D. shared a secret with the twins: she told them that when she was on defendant's bed, he pulled down her pants and touched her buttocks. One of the twins told several adults in the family.

As a result of the disclosure, T.D's mother and T.J's father (who did not yet know his son was also molested) went to the grandfather's house to confront defendant about molesting T.D. T.J's father asked defendant if he was ever worried about getting caught. Defendant said, "At some point." The police were not called at this time.

Over the next few days, T.J.'s mother worried that T.D. might not have been defendant's only victim. Knowing that T.J. spent a lot of time at his grandfather's house,

3

she asked him if he knew defendant to have molested any of the other kids. T.J. finally told his mother everything.

T.J.'s father was furious. He piled his family into the car and drove over to the grandfather's house. T.J.'s father walked up to defendant, said, "You touched my kid too?" and socked him in the face. A large family fight ensued, and poured out into the street. T.J.'s mother called the police.

When the police arrived, they separated everyone. Defendant repeatedly called out to T.J.'s mother, saying, "I'm sorry."

D.    Defendant's Admission

Defendant was arrested and taken to the sheriff's station. He agreed to speak to a deputy, and the first thing he said was that he wanted to make sure the deputy told both of his cousins that he was sorry for what he had done, and that he did not mean to hurt them. Defendant stated that he had urges that he was unable to control and that he had made a promise to himself to try to stay away from them. Defendant admitted molesting T.J. He also admitted that he had removed T.D.'s pants and underwear and had touched her bare buttocks.

E.    T.D.'s Statement

Deputy Glenn Greathouse testified he went to T.D's house to take her statement. She sat in her mother's lap. According to the Deputy, she told him that "when she went to her cousin Daveon's bedroom to go to sleep, which was downstairs by the bathroom, she was [lying] on his bed and Daveon had come in, while she was there, had pulled down her pants and underwear, and stuck his finger in her butt."[2]

---

[2]    At trial, the prosecution did not assert that defendant had digitally penetrated T.D. All other evidence – from T.D., the twins, and T.J.'s mother (whom T.D. also told) – was consistent in that defendant had touched T.D., not penetrated her. We assume, consistent with the prosecution's approach to the evidence, that Detective Greathouse misspoke.

4

## 2. *Charges and Trial*

Defendant was ultimately charged by amended information with nine counts of forcible lewd acts against a child under 14. (Pen. Code, § 288, subd. (b).)[3] Eight of the counts pertained to T.J.; one pertained to T.D. A multiple victim enhancement was alleged pursuant to section 667.61. The case proceeded to trial.

At the trial, the prosecution elicited testimony from both victims. Each one was accompanied to the witness stand by two support persons. T.D. was frightened and reluctant to testify. Her brief testimony was corroborated by the twins, Deputy Greathouse, and T.J.'s mother, who all confirmed that T.D. reported defendant had pulled down her pants and touched her buttocks. The prosecution also offered expert testimony on the Syndrome, in order to explain to the jury that a child delaying disclosure of sexual abuse is not unusual.

Defendant offered evidence that he was, in some ways, mentally delayed – possibly due to a fall from a second-story window at a young age. He was in special education from the time he started school, and performed below academic level. He suffers from "auditory processing deficits." He has difficulty processing things that he hears; if given enough time, he can respond, but his response is delayed. He was evaluated by a psychologist who concluded that he was intellectually impaired. However, the psychologist could not determine the scope of the impairment as defendant's performance on a test designed to distinguish impairment from malingering showed possible malingering.

## 3. *Conviction and Sentencing*

The jury found defendant guilty as charged. At sentencing, the court was concerned that a life sentence, mandated by the multiple victim enhancement, was too harsh for defendant. The court noted that, at the time of the single offense against T.D., defendant was a minor himself. The court also recognized that defendant was mentally delayed and had no prior record. Concluding that even a single life sentence would

---

[3] All future statutory references are to the Penal Code.

constitute cruel and unusual punishment under the circumstances, the court struck the multiple victim enhancement. Defendant was sentenced to consecutive low terms on each offense. For each of the eight offenses against T.J, the low term was five years; for the (earlier) offense against T.D., the low term was three years. Defendant received a total sentence of 43 years in prison. Defendant filed a timely notice of appeal.

## DISCUSSION

We first address defendant's contentions pertaining to the insufficiency of the evidence that the offense against T.D. was forcible. We then turn to defendant's remaining arguments.

1. *The Evidence of Forcible Acts Against T.D. is Insufficient*

    A. <u>Standard of Review</u>

Claims challenging the sufficiency of the evidence to uphold a judgment are reviewed under the substantial evidence standard. Under this standard, " ' "an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt." ' [Citation.]" (*In re George T.* (2004) 33 Cal.4th 620, 630-631.)

    B. <u>Forcible Lewd Acts</u>

Section 288, subdivision (a) punishes "any person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ." Subdivision (b)(1) punishes "[a]ny person who commits an act described in subdivision (a) *by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . .*" (Italics added.) There is no dispute that defendant violated section 288, subdivision (a) when he touched T.D.; the issue is whether he also violated subdivision (b), by using force, violence, duress, menace, or fear of immediate and unlawful bodily injury.

6

At trial, the prosecution relied only on duress. The same is true on appeal. As there was no argument, and no evidence, supporting any of the other bases, we limit our discussion to duress.

" '[D]uress as used in the context of section 288 [means] a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' [Citation.]" (*People v. Cardenas* (1994) 21 Cal.App.4th 927, 939.) The "definition of duress is objective in nature and not dependent on the response exhibited by a particular victim." (*People v. Soto* (2011) 51 Cal.4th 229, 246.)

In appraising the existence of duress, the totality of the circumstances, including the age of the victim and the victim's relationship to the defendant, should be considered. (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1579.) The position of dominance and authority of the defendant is a relevant factor. (*People v. Cardenas, supra,* 21 Cal.App.4th at p. 940.) There is some disagreement in existing caselaw regarding the extent to which an implied threat, sufficient to establish duress, can be inferred simply from the dominance and authority the defendant possesses over a victim. For example, in *People v. Cochran* (2002) 103 Cal.App.4th 8, 15 (*Cochran*), disapproved on other grounds in *People v. Soto, supra,* 51 Cal.4th at page 248, footnote 12, duress was established when the victim appeared to comply with her father's directions "only in response to her father's parental and physical authority." The court concluded the victim's "compliance was derived from intimidation and the psychological control he exercised over her and was not the result of freely given consent." (*Cochran,* at p. 15.) In response to the defendant's assertion that this conclusion would eliminate the distinction between subdivision (a) and subdivision (b), the court stated that it did not, but added, "as a factual matter, when the victim is as young as this victim and is molested by her father in the family home, in all but the rarest cases duress will be present." (*Id*. at p. 16, fn. 6.)

In contrast, in *People v. Espinoza* (2002) 95 Cal.App.4th 1287, the appellate court found insufficient evidence of duress where the victim had been too scared to react when her father repeatedly came into her bedroom, pulled down her pants, and touched her breasts and vagina. (*Id.* at pp. 1292-1293.) The court stated, "The only way that we could say that defendant's lewd act[s] . . . were accomplished by duress is if the mere fact that he was [the victim]'s father and larger than her combined with her fear and limited intellectual level were sufficient to establish that the acts were accomplished by duress." (*Id.* at p. 1321.) The court concluded that duress was not established because there was no evidence of any direct or implied threat. "While it was clear that [the victim] was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her. It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation." (*Ibid.*)

As we shall now explain, we need not take sides in this dispute as, even under *Cochran*, there was insufficient evidence of duress introduced at trial.

C.     Prosecution's Evidence of Duress with Respect to T.D.

At trial, there was overwhelming evidence that, on one occasion in 2009, when T.D. was sleeping, defendant came into the bedroom, pulled down her pants, and touched her buttocks. T.D. was five at the time; defendant was a teenager. There was no evidence of defendant's height or weight at this time; he was, however, six-foot-seven in 2012, and there is no suggestion that he was not, in fact, quite large compared to his five-year-old cousin.

It can be inferred that T.D. was not asleep during the time defendant victimized her; T.D. was the first person to disclose the molestation, so she must have been awake to know that it was happening. It could also be inferred, by the fact that she did not immediately tell someone it had happened, that, for one reason or another, she did not wish to do so.

That is, however, as far as the evidence at trial goes. It is speculative to suggest that T.D. did not tell out of fear. There was no evidence that T.D. was frightened of

8

defendant – either at the time of the molestation or at trial. There was no evidence that her failure to disclose was the result of any fear. Nor, importantly, was there evidence that defendant had a position of authority over T.D. from which duress could be inferred under cases such as *Cochran*. Defendant was a cousin, not a parent; and a mentally-delayed teenager, not an adult. There was no testimony that T.D. had ever been told by her parents to do as defendant told her, or that defendant had a position of authority over his younger cousins in general. Any inference of duress would have to be based on the disparity in age and size between defendant and T.D.; no case has found an implied threat in such circumstances alone. This is simply not enough to support the jury's verdict.

D.    Evidence Not Admitted at Trial

There is some evidence in the record, but not admitted at trial, which potentially could have supported a finding of duress, had it been admitted. The prosecutor, however, simply failed to offer this evidence. At the preliminary hearing, T.D. had told the judge that she was scared when defendant touched her, and that she moved to the side to stop defendant. The prosecution's trial brief later indicated, "[T.D.] pretended to 'fake sleep' and moved to stop [defendant] from touching her further." The source of this information may have been the police report; the probation report indicates that T.D. informed detectives that she felt defendant pull her pants down "and pretended to 'fake sleep.'" However, no evidence regarding T.D. faking sleep or moving her position was elicited at trial.

The prosecution mistakenly relied on this evidence at trial, and does so again on appeal. In arguing to the jury, the prosecutor represented that T.D. told Deputy Greathouse that she had been afraid and pretended to fake sleep.[4] In the respondent's brief on appeal, the prosecutor twice argues that the fact that T.D. pretended to sleep is a

_____

[4]    On appeal, defendant contends the prosecutor committed intentional misconduct in making this argument. As we will reduce the offense to the lesser due to insufficient evidence on the element of force, fear or duress, it is unnecessary to reach the prosecutorial misconduct argument. However, there is nothing in the record suggesting the prosecutor's misstatement was anything other than a good faith error.

9

factor which helps establish duress. Yet the prosecutor failed to introduce evidence of feigned sleep at trial; it thus cannot provide support for the jury's finding of duress.[5]

### E. The Appropriate Remedy

Section 288, subdivision (a) is a lesser or necessarily included offense of subdivision (b). (*People v. Ward* (1986) 188 Cal.App.3d 459, 472.) An appellate court that finds insufficient evidence supporting a conviction for a greater offense may, in lieu of granting a new trial, modify the judgment of conviction to reflect a conviction of a lesser included offense if there is sufficient evidence of the lesser included offense. (*People v. Bailey* (2012) 54 Cal.4th 740, 748.)

Defendant argues that we should exercise our discretion to instead reverse the conviction of molesting T.D. outright. Defendant argues this is the only equitable result in light of his claim of prosecution gamesmanship. We find no gamesmanship and reject defendant's argument.

When counsel were discussing jury instructions with the court, the prosecutor stated, "The People and the defense are still – I'm going to research the issue of lesser included. The crimes charged in the information are forcible lewd acts on a child. [¶] It's my opinion that lewd act on a child is the lesser included of forcible lewd act, and I will have an answer for the court by Monday." When Monday arrived, the prosecutor stated the following, "The first issue that I'd like to bring up before the jury comes out is the discussion on Friday regarding whether or not 288(a)'s a lesser of a 288(b). [¶] I've done my research. CALCRIM bench notes indicates that is not . . . ."[6] In light of the

---

[5] On appeal, the prosecution also notes that defendant "had committed similar crimes against [T.J.], perfecting his technique for intimidating his young relatives." But the crimes against T.J. started two years after defendant had touched T.D.; they cannot provide evidence that defendant used duress against T.D.

[6] The trial court actually instructed the jury with CALJIC No. 10.42. The use notes to that instruction contain no mention of lesser included offenses. The prosecutor's reference to the CALCRIM bench notes during argument to the court was apparently to CALCRIM No. 1111. The "LESSER INCLUDED OFFENSES" section to CALCRIM No. 1111 lists only "Attempted Lewd Act by Force With Child Under 14."

prosecutor's mistaken belief that section 288, subdivision (a) was not a lesser included offense of section 288, subdivision (b), the prosecutor filed an amended information adding a single count of section 288, subdivision (a), committed against T.D. Defendant objected to the amendment as untimely, and the trial court agreed. Subsequently, in light of her mistaken belief that subdivision (a) was not a lesser included offense of subdivision (b), the prosecutor indicated that she was not seeking an instruction on lesser included offenses. Defense counsel remained silent and did not argue that defendant was, in fact, entitled to an instruction on subdivision (a) as a lesser included offense.

On appeal, defendant argues that the prosecutor "forfeited the discretionary benefit of having [defendant's] conviction reduced" to a violation of subdivision (a), because the prosecutor knowingly overcharged defendant and then made the decision that the jury should not be instructed on the lesser offense. On the contrary, it appears that the prosecution had a legitimate basis to initially charge defendant with the subdivision (b) offense, given T.D.'s preliminary hearing testimony and the police report, but mistakenly failed to introduce at trial the evidence relating to T.D.'s movement and fear, and may have ultimately concluded that the references to penetration were not credible. When it appeared arguable that defendant may have violated only subdivision (a), the prosecutor researched whether the jury could be instructed on subdivision (a) as a lesser included offense. Having found no authority in the CALCRIM notes, the prosecutor believed it was not a lesser included offense, and attempted to amend the information to place subdivision (a) before the jury, only to be stopped by defendant's untimeliness objection. Ultimately, both the prosecutor and defense counsel were equally responsible for subdivision (a) not being before the jury. There is no basis for us to conclude that the prosecution has somehow forfeited the right to have defendant's conviction reduced. We will therefore modify the judgment to reduce count nine – the count of section 288,

11

subdivision (b) against T.D. – to a count of section 288, subdivision (a).  This will have no effect on defendant's sentence.[7]

2.      *Support Persons*

Both victims testified with two individuals near the witness stand for support. None of the support persons were witnesses at trial, and, with a single exception, defendant made no objection to the use of persons in support.  On appeal, defendant contends the trial court erred in not satisfying prerequisites to T.J.'s use of support persons.

Section 868.5, subdivision (a) provides, in pertinent part, "Notwithstanding any other law, a prosecuting witness in a case involving a violation or attempted violation of Section . . . 288 . . . shall be entitled, for support, to the attendance of up to two persons of his or her own choosing, one of whom may be a witness, at the preliminary hearing and at the trial, or at a juvenile court proceeding, during the testimony of the prosecuting witness.  Only one of those support persons may accompany the witness to the witness stand, although the other may remain in the courtroom during the witness' testimony . . . ."  Subdivision (b) of the statute provides, "If the person or persons so chosen are also witnesses, the prosecution shall present evidence that the person's attendance is both desired by the prosecuting witness for support and will be helpful to the prosecuting witness.  Upon that showing, the court shall grant the request unless information presented by the defendant or noticed by the court establishes that the support person's attendance during the testimony of the prosecuting witness would pose a substantial risk of influencing or affecting the content of that testimony. . . .  In all cases, the judge shall admonish the support person or persons to not prompt, sway, or influence

---

[7]      Defendant molested T.D. before the 2010 amendment to section 288.  Before the amendment, violations of subdivision (a) and subdivision (b) were both punished by imprisonment for three, six, or eight years.  The amendment left the penalty for violating subdivision (a) unchanged, but increased the penalty for violating subdivision (b) to five, eight, or ten years.  Defendant initially received the three-year low term for a pre-2010 violation of subdivision (b).  Presently the low term for a violation of subdivision (a) remains at three years, the sentence defendant originally received.

12

the witness in any way. Nothing in this section shall preclude a court from exercising its discretion to remove a person from the courtroom whom it believes is prompting, swaying, or influencing the witness."

On appeal, defendant argues the court erred in not satisfying the subdivision (b) prerequisites that require the prosecution to establish that the support persons were desired by T.J. and would be helpful to him. The simple rejoinder to that argument is that those portions of subdivision (b) do not apply because none of T.J.'s support persons were witnesses.

Defendant also argues the court did not admonish the support persons not to influence the witness's testimony. To put this argument in context, at one point during T.J.'s testimony, it appears that one or both of his support persons may have said something to him, although the substance is not reflected in the record. Defense counsel stated, "Your honor, I'm going to object to support people aren't to be communicating with him." The trial court agreed, and admonished the support persons, "You shouldn't be saying anything. [¶] Do you understand that?" Defendant did not expressly request the statutory admonition either at that time or before; he simply objected when the support people may have communicated with T.J., and received, in response, an admonition to the support people not to communicate with T.J. In short, to the extent defendant objected, he received exactly the relief he sought. (See also *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1169 [statutory admonition not required if support persons do not testify].)

3. *Child Sexual Abuse Accommodation Syndrome Testimony*

At trial, defense counsel cross-examined T.J. at length as to why he continued to return to defendant's room if that was where he was molested. (E.g., "Well, this room is a room of horrors, but you went in there voluntarily; isn't that true?") T.J. was also questioned on why he never cried out to the adults in the house while he was being attacked. (E.g., "And so if you had spoke your father would have been able to hear you in the living room; isn't that true?")

In response, the prosecution elicited expert testimony on the Syndrome. The Syndrome has five parts: the first two explain that abuse happens in secret and that the victims are helpless; the third is that the victims are more likely to go along with the abuse; and the fourth and fifth are that disclosure of abuse is often delayed and that sexually abused children sometimes recant. The expert also testified that it is common for child abuse victims to act as though everything is fine, including returning to the perpetrator's house regularly. She explained that it is easier for abuse victims to simply do what people expect, because if they do not, they would be asked to explain why, which might force them to talk about the abuse.

The Syndrome does not predict sexual abuse; the expert expressly testified that she made no determination as to whether abuse had occurred in this case. Instead, the Syndrome explains behavior which is contrary to common expectations. Specifically, it helps us understand why children do not immediately disclose abuse. There is a standard jury instruction, which was given in this case, explaining that the jury is not to consider Syndrome evidence as proof that the victims' molestation claims are true, but only "for the limited purpose of showing, if it does, that the alleged victims' reactions, as demonstrated by the evidence, are not inconsistent with having been molested." (CALJIC No. 10.64.)

Prior to the Syndrome expert testifying, defendant objected on the basis that Syndrome testimony is only relevant when the children recant, and the children did not recant in this case. The objection was overruled. On appeal, defendant argues Syndrome evidence should not have been admitted in this case as it was irrelevant. He argues there were no misconceptions for the Syndrome evidence to correct and that the jury may have incorrectly used the Syndrome as evidence of abuse.

It is too late in the day to argue that Syndrome evidence is inadmissible. " 'Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred. However, [Syndrome] testimony "is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is

14

inconsistent with his or her testimony claiming molestation. [Citations.]" ' [Citations.]" (*People v. Perez* (2010) 182 Cal.App.4th 231, 245; see also *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) Here, the evidence was admitted to rehabilitate T.J.'s credibility when defense counsel's cross-examination suggested T.J.'s failure to cry out and his repeated return visits to defendant's bedroom were inconsistent with his claims of abuse. The expert explained that her testimony was limited in purpose and was not evidence of abuse; the jury instruction confirmed it. The evidence was admitted in accordance with existing law.

4.      *Defendant Should be Granted an Additional Day of Presentence Credit*

Finally, defendant contends, the prosecution concedes, and we agree that his presentence custody credits should be increased to give him one additional day of actual credit. (*People v. Magallanes* (2009) 173 Cal.App.4th 529, 537.)

## DISPOSITION

The conviction on count 9, forcible lewd act with a child under 14 by force or other means (§ 288, subd. (b)) is reduced to a conviction of the lesser included offense, lewd act with a child under 14 (§ 288, subd. (a)). This reduction in offense does not change defendant's sentence. Defendant's actual presentence credit is increased from 680 to 681 days. We direct the trial court to prepare an amended abstract of judgment and forward a certified copy of the amended abstract to the Department of Corrections. In all other respects, we affirm the judgment.


                                                        RUBIN, J.
WE CONCUR:



        BIGELOW, P. J.



        FLIER, J.

15